IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DAKOTA, MINNESOTA & EASTERN
RAILROAD CORPORATION,

                    Plaintiff,                              OPINION AND ORDER

         v.                                                    09-cv-00516-wmc

WISCONSIN & SOUTHERN
RAILROAD CO.,

                    Defendant.

---

In 2004, defendant Wisconsin & Southern Railroad Co. ("WSOR") purchased rail lines in and around Janesville, Wisconsin from a company later acquired by the plaintiff Dakota, Minnesota & Eastern Railroad Corporation ("DM&E"). DM&E now alleges that WSOR breached the purchase terms by using a spur track over which the seller retained exclusive access rights and, in doing so, trespassed on certain personal property also retained by the seller. The outcome of DM&E's claims depends upon how one reads the 2004 asset purchase and trackage rights agreements, as well as the closing documents, which collectively establish the material terms of sale for purposes of this dispute. The parties have now cross-moved for summary judgment as to the meaning of these terms and the court will grant judgment to WSOR because a plain reading of the key transactional documents establish that (1) WSOR did not violate DM&E's exclusive easement to the spur track and (2) DM&E did not retain an ownership interest in the personal property WSOR is alleged to have trespassed. Though unnecessary to resolve this dispute, the court further finds any arguable ambiguity in the material terms must be resolved in WSOR's favor in light of the extrinsic evidence leading up to the sale.

UNDISPUTED FACTS[1]

**A.  The Parties**

Plaintiff DM&E is a railroad company that operates in several states, including Wisconsin.  DM&E is a successor by merger to the Iowa, Chicago & Eastern Railroad Corporation ("IC&E").  DM&E and IC&E merged in 2007, three years after the transaction at issue in this case.  Defendant WSOR is a competing railroad company.

**B.  Jurisdiction**

The court has jurisdiction over this case pursuant to 28 U.S.C. § 1332.  Plaintiff DM&E is a corporation organized under the laws of the State of Delaware with its principal place of business in Sioux Falls, South Dakota.  (Compl. (dkt. #1) ¶ 1.)  Defendant WSOR is a corporation organized under the laws of the State of Wisconsin, with its principal place of business in Milwaukee, Wisconsin.  (*Id.* at ¶ 2.)  Claimed damages and the value of the future rights at issue exceed $75,000 in value.

**C.  Documented Sale of Rail Lines**

On June 8, 2004, IC&E and WSOR entered into an Asset Purchase Agreement ("APA") for the sale of approximately seven miles of rail lines in and around Janesville, Wisconsin (the "Rail Lines") to WSOR.  Several provisions of the APA and related documents are central to the issues in this case.

---

[1] The following facts are derived from the parties' undisputed proposed findings of facts viewed in a light most favorable to DM&E.

**1. Asset Purchase Agreement**

Section 1.01 of the APA sets forth the assets to be sold by IC&E to WSOR in four categories: (i) real property constituting the Rail Lines; (ii) fixtures and articles of personal property attached to or located on the real property; (iii) interests in and to the leases, easements, licenses, etc. pertaining to the Rail Lines; and (iv) all governmental licenses and permits pertaining to the Rail Lines. As the real and personal property, the section provides in relevant part:

> 1.01. <u>Assets to be Sold</u>. …Seller shall sell, convey, transfer and deliver to Buyer, on an "as is, where is" basis, all right, title and interest of Seller in and to (i) the real property that constitutes the Rail Lines,[2] consisting of all of the right, title and interest in real property located in Rock County, Wisconsin north of Milepost 45.23 (<u>subject to retention of an easement by Seller for spur trackage used solely to serve Freedom Plastics</u>), as more particularly described in the Deed (as defined below), (ii) all fixtures and articles of personal property attached to or located on the real property that constitutes the Rail Lines, including without limitation rail and other track material, ties, wires, switches, turnouts, crossovers, pipes, conduits, electrical and mechanical signal devices and radio and other communication facilities, <u>except for spur trackage used solely to serve Freedom Plastics</u> (which trackage shall not include the track switch to Freedom Plastics), . . .

(Affidavit of John Brooks ("Brooks Aff.") (dkt. #28), Ex. A ("APA") § 1.01 (emphasis added).)

The underscored references to "spur trackage" located adjacent to the Freedom Plastics facility (the "Spur Track") is the focal point of the current dispute. A spur trackage or spur track is "[a] short side track that connects with the main track of a

---

[2] Rail Lines is defined as "7.33 route miles of rail lines and related properties as shown between Points A, B, C and D on Exhibit A [to the APA]." (APA at p.2.)

railroad system." The American Heritage Dictionary (4th ed. 2009).[3]  As reflected above, in selling the real property constituting the Rail Lines, IC&E retained an easement as well as ownership of the personal property constituting, "spur trackage used solely to serve Freedom Plastics."

As part of the transaction, IC&E also retained rights to access the Rail Lines, including in certain, limited respects, exclusive access.  Section 1.02 of the APA describes those rights in relevant part:

> 1.02.  <u>Retention of Trackage Rights/Exclusive Access</u>.  . . . Seller shall retain trackage rights ("Trackage Rights") over the Rail Lines (including the West Yard) for all purposes, including but not limited to interchanging traffic with Buyer and with any railroad now or in the future connecting to the Rail Lines (including but not limited to UP[4]), providing overheard service, and serving all present and future industries on the Rail Lines, as more particularly set forth in a trackage rights agreement substantively in the form of Exhibit B hereto (the ["]Trackage Rights Agreement").  <u>Seller shall retain via the Trackage Rights exclusive access and the sole right to use the Rail Lines to provide rail freight transportation service to Freedom Plastics and the sole right to use the Rail Lines to provide rail freight transportation service to Janesville Sand and Gravel ("Current Industry"),</u> including any relocation or expansion that such Current Industry may undergo and whether or not such Current Industry ships or receives by rail on the date of this Agreement.  <u>Buyer shall not have the right to use the Rail Lines to provide service to any Current Industry</u>. . . .

---

[3] The Spur Track at issue is not readily discernable on the map showing the transferred Rail Lines, which is part of the TRA. (*See* Brooks Aff., Ex. B at DM&E002704.)  One can, however, discern from photos that the spur track curves away from the main track and then returns to it, so that from above the spur track resembles a "c" attached to the main Rail Lines.  (*See* Declaration of Bernard M. Meighan ("Meighan Decl.") (dkt. #55), Ex. B.)

[4] UP refers to Union Pacific Railroad Company which has rail lines connecting to the Rail Lines at issue here.  (APA at p.2.)

(APA at § 1.02 (emphasis added).)[5]

### 2.  Trackage Rights Agreement

The parties' Trackage Rights Agreement ("TRA") referenced in the APA and signed at the actual sale closing on July 30, 2004, provides additional detail about the nature of the parties' respective rights to access and use the Rail Lines.  Consistent with § 1.02 of the APA, the TRA provides with respect to service of Freedom Plastics and Janesville Sand and Gravel -- the "Current Industry" -- in relevant part:

> Section 2.  RETENTION OF TRACKAGE RIGHTS
>
> 2.1   IC&E shall have the right to use the Rail Lines . . . . [and] shall have exclusive access, and the sole right to use the Rail Lines to provide rail freight transportation service, to Freedom Plastics and the sole right to use the Rail Lines to provide rail freight transportation service to Janesville Sand and Gravel ("Current Industry"), including any relocation or expansion that such Current Industry may undergo, and whether or not such Current Industry ships or receives by rail on the date of the Purchase Agreement, it being understood that <u>WSOR shall not have the right,</u> without written permission from IC&E, <u>to</u>:
>
> (a)   <u>directly serve any such Current Industry</u> located adjacent to or on trackage connecting to the Rail Lines, nor have the right to construct switches and trackage from the Rail Lines to any such Current Industry, nor
>
> (b)   permit any third party to use the Rail Lines to perform any service, conduct any operation or otherwise do anything WSOR is not permitted to do hereunder.

(Brooks Aff., Ex. B ("TRA") § 2.1 (emphasis added).)

---

[5]  Freedom Plastics was IC&E's only active customer on the Rail Lines at the time of the sale, and Janesville Sand and Gravel was a former customer.

At the same time, the TRA provides for the parties' co-extensive rights to access and use the Rail Lines for serving "General Motors Corporation,"[6] "any other existing industry" and "any New Industry that locates on the Rail Lines after the date of the Purchase Agreement." (*Id.*)   Unlike for "Current Industry," there is no restriction on WSOR's access to the Rail Lines to serve "Existing Industry" and "New Industry."   In exchange for continued use of the Rail Lines after the sale, IC&E agreed to pay annual compensation to WSOR on the Rail Lines calculated in accordance with § 9.1 of the TRA.[7]

### 3. Quit Claim Deed

IC&E drafted[8] and the parties executed at closing the formal quitclaim deed, which provides in relevant part:

> . . . Grantor hereby CONVEYS AND QUIT CLAIMS unto Grantee . . . all of the Grantor's right, title, interest, estate, claim, and demand in and to the lines of railroad described in the attached Exhibit A (Pages 1 & 2), including the real property, estates roadbeds, rights-of-way, station grounds, railroad yards, yard and terminal facilities, locomotive servicing repair facilities, freight car repair facilities, fixtures and appurtenances thereto; <u>together with</u> **all improvements and structures located thereon, therein, or thereunder**, and specifically **including**…associated rail facilities, including without limitation all rails, ties, ballast, switches, turnouts,

---

[6] General Motors Corporation has a facility adjacent to or on the Rail Lines, but it was not a current or former customer of IC&E at the time of sale.

[7] The TRA provides for liquidated damages of approximately $1000 per car for each car handled in a way that violates § 2.1 of the TRA.

[8] While there is uncertainty whether someone at IC&E or IC&E's outside counsel's office drafted the Deed, it is undisputed that one or the other drafted the deed. (*See* Def.'s Opening Br. at 13 & n.2.)

> wyes, crossovers, grade crossings, machinery, fixtures, rights-of-way (and improvements thereto), pipes conduits, wires, communication and signal devices and facilities . . . , parking and storage areas, sidings, **spurs**, trestles, bridges, and culverts. . . .

(Brooks Aff, Ex. C ("Deed") at WSOR000019 (underlined emphasis in original; bold emphasis added).)  Exhibit A to the Deed, describing the property conveyed, includes the Spur Track itself referenced as station map "V. WIS. 18 S-T-3C - West Yard to West end (Freedom Plastics)."  (*Id.* at WSOR0R00020.)

The Deed also describes an easement to the Spur Track:

> Property Excepted -- Excepting, however an easement for all that part of the Grantor's right of way, Nine (9) feet from track centerline commencing from the Freedom Plastics point of switch to property line approximately two hundred (200) feet in length as described on station map V. WIS 18 S-T-3c for the sole purpose of serving Freedom Plastics.

(*Id.* at WSOR000021.)


## D. NAPCO's Purchase of Freedom Plastics' Janesville Facility and Subsequent Actions

From the date of purchase until early 2009, WSOR did not provide rail service to Freedom Plastics, consistent with its agreement to give IC&E the exclusive right to do so. On February 2, 2009, however, Freedom Plastics initiated receivership proceedings in the Circuit Court for Rock County, Wisconsin.  On March 16, 2009, an auction was held by a court-appointed receiver at which three different companies purchased assets previously owned by Freedom Plastics.  Westlake Chemical purchased most of the assets, including the Freedom Plastics facility in Janesville, Wisconsin, located on the Spur Track. Pursuant to that sale, the receiver executed a quitclaim deed formally transferring

ownership of the Janesville facility to North American Pipe Corporation ("NAPCO"), a subsidiary of Westlake Chemical.

In April 2009, Westlake Chemical's Transportation Manager, Jeff Torbett, contacted Jim Lombard, WSOR's Vice President of Marketing, requesting that WSOR provide various shipping and storage rates for NAPCO.  DM&E somehow learned of Westlake Chemical's request for rates from WSOR and informed Westlake Chemical that WSOR did not have the right to serve the NAPCO plant.  WSOR disagreed and submitted rates to NAPCO.

In June 2009, WSOR began to provide freight services to NAPCO.  DM&E protested WSOR's use of the Rail Lines, including the Spur Track, to serve NAPCO by temporarily locking the spur track switch and sending WSOR letters to cease service to NAPCO.  Since beginning to use the Spur Track to serve NAPCO, WSOR has contributed to its maintenance.

On December 18, 2009, WSOR sold the Rail Lines, except for the Spur Track, to the Wisconsin Department of Transportation.  The Spur Track was excluded from the sale because of the present dispute.  As part of this transaction, WSOR retained its right to use the Rail Lines.  DM&E's right to access the Rail Lines was also preserved.


OPINION

After adequate time for discovery, a party is entitled to summary judgment if it shows that "there is no genuine issue of material fact and that [it] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  DM&E filed this action against WSOR on August 20, 2009.  DM&E

alleges four causes of action -- Count I: Breach of the APA; Count II: Breach of the TRA; Count III: Trespass; and Count IV: Accounting.  All four counts turn on two central questions of law:

1. What is the scope of DM&E's exclusive access and rights to the Rail Lines?

2. What are the parties' respective interests in the Spur Track?

The answer to the first question resolves the counts for breach of contract and the answer to the second question resolves DME's third count for trespass.  Because each of these questions are answered in favor of defendant WSOR as a matter of law, as well as undisputed fact, DM&E's fourth count for accounting is denied as moot.


**A.  Scope of DM&E's Exclusive Access and Sole Rights to Rail Lines**

The parties dispute the meaning of "Freedom Plastics" in the provision in the APA and TRA granting DM&E "exclusive access and the sole right to use the Rail Lines to provide rail freight transportation service to Freedom Plastics."  DM&E contends that this provision means that "DM&E has a continuous right to exclusive and sole access to serve the industry located at the Freedom Plastics facility, and not just Freedom Plastics, Inc., the specific corporate entity."  (Pl.'s Opening Br. (dkt. #27) at 8-9 (emphasis added).)  In contrast, WSOR contends that the APA and TRA only grant DM&E the exclusive right to use the rail lines to serve Freedom Plastics, the corporate entity and DM&E's former customer, and that Freedom Plastics is not NAPCO, the current owner of the facility at issue.  (Def.'s Opening Br. (dkt #50) at 20.)

### 1.    Plain language of the APA and TRA

"When interpreting an agreement, the court's objective 'is to ascertain the true intentions of the parties as expressed by the contractual language.'" *First Bank & Trust v. Firstar Info. Servs., Corp.*, 276 F.3d 317, 322 (7th Cir. 2001) (quoting *State ex rel. Journal/Sentinel, Inc. v. Pleva,* 155 Wis. 2d 704, 711, 456 N.W.2d 359, 362 (1990)).  The court first considers the plain language of the agreement.  *First Bank & Trust*, 276 F.3d at 322 (citing *Bank of Barron v. Gieseke*, 169 Wis. 2d 437, 455, 485 N.W.2d 426, 432 (1992)).

DM&E's interpretation of the APA and TRA requires the court to read language into the contract which is not there.   Under DM&E's interpretation, one must at minimum insert "facility" or "location" after "Freedom Plastics" into these contract provisions to arrive at any arguable, ongoing exclusive access rights to serve NAPCO, the current owner of the facility located on the Spur Track.  In its brief, DM&E tellingly uses a "short" citation "Freedom Plastics facility" to refer to "Freedom Plastics."   (Pl.'s Opening Br. at 3.)

Indeed, even inserting "facility" or "location" into these contractual provisions would, at most, make the contract provisions ambiguous, absent additional language like that DM&E offers in various forms in its brief to the effect that the exclusive rights run to any industry or business located at the Freedom Plastics facility.  (*See, e.g.*, Pl.'s Opp'n Br. (dkt. #56) 1 (DM&E "retain[ed] exclusive access to the industry which was occupied by Freedom Plastics Inc. at the time of the closing in 2004.").)  Moreover, any insertion of additional words runs counter to the otherwise plain meaning of the provisions -- namely, that "Freedom Plastics" refers to the corporate entity, or at least that

corporation's ongoing business, and DM&E's former customer, <u>not</u> the physical location. The absence of "facility," "location," "plant," or similar words is telling:  the insertion of any of these words -- or more to the point, a typical description of the physical location by metes and bounds -- would have been an easy and obvious modification to define DM&E's exclusive access rights to the location, not its former customer.

Plaintiff contends that it is the absence of "Inc." that is truly telling, and signals that the parties did not intend for "Freedom Plastics" to refer to the corporate entity. (Pl.'s Opening Br. at 13.)  But "Inc." is commonly left off of the names of corporate entities in legal documents, as are other abbreviations indicating an entity's particular legal status.  In other words, "Inc." is not necessary in order for "Freedom Plastics" to refer to the corporate entity, its business or, at least, the customer.  On the other hand, the absence of "facility" or "location" -- or some other words to indicate plainly that the parties intended to refer to <u>any</u> business <u>at</u> that physical location -- makes DM&E's contention that "Freedom Plastics" means the "Freedom Plastics facility," much less any business conducted there in perpetuity, highly unlikely.

Wisconsin law also requires the court to construe the provisions at issue in the context of the contract as a whole.  *Tempelis v. Aetna Cas. & Sur. Co.*, 169 Wis. 2d 1, 9, 485 N.W.2d 217, 220 (1992).  Predictably, the parties both point to other terms and provisions in the APA to support their respective interpretations of the exclusive access provision.

Each party argues that the provision in § 1.02 of the APA and § 2.1 of the TRA -- that DM&E's exclusive access rights to serve Freedom Plastics includes "any relocation or expansion that such Current Industry may undergo" -- supports their respective

11

interpretations. The "expansion" provision arguably neither supports nor undermines either interpretation, because "expansion" makes sense both in terms of expansion of the facility (under DM&E's interpretation) and expansion of the corporate entity's operations (under WSOR's interpretation).

The "relocation" provision, however, supports WSOR's interpretation that "Freedom Plastics" refers to the corporate entity or, at least, to its business. Because DM&E's interpretation of the exclusive access rights is tied to a specific physical location on the Spur Track at issue, the concept that DM&E's exclusive access rights would be subject to a "relocation of that location" is nonsensical.

DM&E also points to certain language in § 1.01 of the APA for support of its interpretation, arguing that the granting of an easement of the real property and retained ownership of the personal property constituting the Spur Track would be rendered inexplicable if its exclusive access rights were limited to Freedom Plastic as a corporate entity, rather than as a location. WSOR counters that § 1.01 restricts DM&E's easement to be "used solely to serve Freedom Plastics," and since Freedom Plastics no longer exists the easement has no present value. Both sides may have a point. The phrase "used solely to serve Freedom Plastics" could be either a condition granting an easement <u>only</u> to serve the Freedom Plastics' business -- as WSOR contends -- or a descriptor (the spur track that is "used solely to serve Freedom Plastics") -- as DM&E contends.

Whether the phrase is a descriptor or a condition of use, however, the easement is unnecessary in light of § 1.02 and the TRA's grant of access to DM&E to <u>all</u> of the Rail Lines (not just the Spur Track). [Further, as discussed below in Part B, the APA's provision transferring the Rail Lines' personal property has been merged into the Deed,

12

which transfers <u>all</u> personal property (with no exception for the Spur Track) to WSOR.] As such, DM&E does not have an ownership interest in the personal property constituting the Rail Lines.  Even if it were not controlling as a matter of law, the ultimate language in the Deed is further evidence that the parties did not intend that DM&E have exclusive access to all business on the Spur Track itself in perpetuity, but rather only so long as the business was with Freedom Plastics.  Moreover, the extrinsic evidence discussed in the next section undermines any attempt to define DM&E's exclusive access rights in light of any retained ownership interest under § 1.01.

Both parties also rely on other provisions in the TRA for support.  <u>First</u>, WSOR contends that NAPCO falls under the "New Industry" category, which as defined by the TRA would be up for grabs by either company, because the facility currently occupied by NAPCO may have been vacant prior to its purchase.  There is, however, no evidence in this record that the building was vacant.  On the contrary, as DM&E points out, the sale by which NAPCO acquired the Freedom Plastics facility was a "going concern" auction, and DM&E continuously served the facility before, during and, on a non-exclusive basis, after NAPCO's acquisition of the relevant part of Freedom Plastic's assets.[9]  Also, the time between Freedom Plastics being placed in a receivership and the date of the sale was relatively compressed at slightly over one month.[10]

---

[9] The court does not need to decide whether the outcome would be different had NAPCO acquired the Freedom Plastics facility not as an asset, but as part of its acquisition of the corporate entity itself by merger or otherwise.

[10] The court finds unpersuasive DM&E's contention that a facility must have been vacant prior to the date of the APA itself for the new company to qualify as "New Industry."  (*See* Pl.'s Reply (dkt. #65) at 3.)  As the court reads § 2.1 of the TRA,

In any event, NAPCO qualifies under the definition of "New Industry," as a new company on the spur track unless one adopts § 1.01 as granting DM&E exclusive access to the Freedom Plastics location. All of that said, whether NAPCO clearly fits within the definition of "New Industry" is, in the end, immaterial, since there is no basis for DM&E's assertion that a company must fit within one of the three categories. What really matters is whether NAPCO is "Current Industry" -- because that is the only basis for DM&E's claim to a continuing right to exclusive access -- and NAPCO does not fall within the scope of that category for the reasons already explained.

Second, DM&E points to language on the first page of the TRA providing that IC&E retained trackage rights "including the retention of exclusive access, and the sole right to use the Rail Lines to provide rail freight transportation service, to certain industries on the Rail Lines" as support for its argument that Freedom Plastics refers to the industry located at the Freedom Plastics facility. (Pls.' Opening Br. at 12-13.) DM&E ignores, however, that "current industries" is later defined in § 2.1 of the TRA as Freedom Plastics and Janesville Gravel and Sand, just as it is in the § 1.02 of the APA. While considering this sole reference to undefined "current industries" wholly out of context, one might imply that DM&E's retained exclusive rights are not limited to service of an individual entity, but rather to categories of industry, such a reading is contradicted by the much more specific, heavily negotiated and straightforward language of the other provisions in the APA and TRA. As reflected in the extrinsic evidence discussed below, the phrase "certain industries" appears, if anything, to be a remnant of broader rights

---

"previously" does not mean vacant prior to the execution of the APA, but rather simply modifies "vacant" -- as in, the building was previously vacant, but is now occupied.

DM&E's predecessor IC&E expressly negotiated away.  In any event, a preliminary use of this phrase grants no rights to either party to the transaction, and certainly does not control over the other, specific statement of the assets to be sold.

### 2.    Extrinsic evidence

Even if the plain language of the APA and TRA were subject to more than one reasonable construction, and the court does not believe it is, the extrinsic evidence offered by the parties consistent with *First Bank & Trust*, 276 F.3d at 322 (citing *Dieter v. Chrysler Corp.*, 2000 WI 45, ¶ 15, 234 Wis. 2d 670, 610 N.W.2d 832), further supports WSOR's interpretation -- namely that DM&E's exclusive access and sole right to use the Rail Lines is limited to serving Freedom Plastics, the corporate entity, its business or, at least, the customer known as Freedom Plastics, none of which continues to exist. Specifically, evidence of the parties' negotiations leading up to the final version of the APA permits only one reasonable conclusion, that DM&E retained exclusive trackage rights in serving its customer, Freedom Plastics, rather than the facility or location previously owned by Freedom Plastics and currently owned by NAPCO.

First, the initial negotiations of the parties, describing the general terms of the proposed sale, demonstrate that the parties intended for IC&E to retain exclusive access to its "existing customers."  IC&E acquired the subject Rail Lines in 2002.  Shortly after that transaction, WSOR approached IC&E about purchasing the Rail Lines.  IC&E initially rejected the offer, but negotiations began again in 2003.

On October 16, 2003, IC&E's then President and CEO, Kevin Schieffer, sent a letter to Bill Gardner, WSOR's President and CEO.  In this letter, Mr. Schieffer set forth IC&E's "final position":

> With the understanding that <u>we retain exclusive access to our existing customers</u> (active or inactive, inclusive of any relocations or expansions they might undergo), and a trackage rights agreement with nominal fees, we would be agreeable to the sale of the Janesville area line for [proposed sale price]. This would allow you to move forward with your yard expansion plans.  <u>Any future customers unrelated to our current customers who might locate on the line could be served by WSOR or IC&E.</u>

(Declaration of Rebecca Frihart Kennedy ("Kennedy Decl.") (dkt. #52), Ex. I (emphasis added).)

On October 20, 2003, Mr. Gardner responded in an email to Mr. Schieffer's letter, indicating that the terms in the letter were acceptable to WSOR.  (*Id.*, Ex. J.)  In further correspondence in November and December 2003, the parties continue to refer to IC&E retaining "exclusive access to [its] existing <u>customers</u>."  (*Id.*, Ex. L (which is also Ex. A to the Dec. 9, 2003 Letter of Intent) (Kennedy Decl., Ex. K)(emphasis added).)

<u>Second</u>, IC&E's attempts to broaden the scope of its exclusive access rights in drafting the APA were repeatedly rejected by WSOR.  IC&E circulated its first draft of the APA on January 22, 2004.  In the first draft of the APA, § 1.02 -- "Retention of Trackage Rights / Exclusive Access" -- provided that IC&E

> shall retain via the Trackage Rights exclusive access and the sole right to provide rail freight transportation service <u>to each industry, shipper, receiver or other facility, including any intermodal or transload facility, located on the Rail Lines or served via trackage connecting to the Rail Lines</u> on the date of this Agreement ("Current Industry"), including any relocation or expansion that such Current Industry may

undergo, and whether or not such Current Industry ships or receives by rail on the date of this Agreement.  Buyer shall not have the right to provide service to any Current Industry. Buyer and Seller shall each have the right to directly serve any new industry (as defined in the Trackage Rights Agreement) that locates on the Rail Lines after the date of this Agreement.

(Kennedy Decl., Ex. N (emphasis added).)

On February 16, 2004, WSOR circulated its redlined edits to IC&E's first draft. With respect to § 1.02, WSOR replaced IC&E's broad description of "Current Industry" and replaced it with "Freedom Plastics":

shall retain via the Trackage Rights exclusive access and the sole right to provide rail freight transportation service on the Rail Lines to Freedom Plastics each industry, shipper, receiver or other facility, including any intermodal or transload facility, located on the Rail Lines or served via trackage connecting to the Rail Lines on the date of this Agreement ("Current Industry"), including any relocation or expansion that Freedom Plastics such Current Industry may undergo on the Rail Lines, and whether or not such Current Industry ships or receives by rail on the date of this Agreement.  Buyer shall not have the right to provide service to any Current Industry Freedom Plastics.  Buyer and Seller shall each have the right to directly serve any new industry customer (as defined in the Trackage Rights Agreement) that locates on the Rail Lines after the date of this Agreement.

(Kennedy Decl., Ex. O.)

In a subsequent email exchange, IC&E's president reacted to WSOR's edits, namely raising concern that WSOR's proposed edits too narrowly defined IC&E's retained exclusive access rights.  (*Id.*, Ex. P at WSOR00453.)[11]  In response, WSOR

---

[11] DM&E contends that the use of "Plastics plant" in the February 16, 2004 email demonstrates IC&E's intent for its exclusive access rights to pertain to the Freedom Plastics facility.  (Pl.'s Opp'n Br. at 11.)  On the flip-side, the use of "plant" here signals the need for such a modifier (i.e., plant, facility, location, etc.) to mean facility rather than the corporate entity and IC&E's customer.

17

explained the purpose of the edits: "By listing out the specific customer(s), we were merely trying to avoid any confusion or misunderstanding that may occur in the future." (*Id.*, Ex. Q at WSOR003772.)

The parties exchanged another round of drafts in which IC&E inserted language which would have once again more broadly defined the scope of its exclusive access rights (*see id.*, Ex. R at DM&E000078-79), and WSOR again rejected the language (*see id.*, Ex. S at DM&E 000124).  After this second round of edits, the negotiations stalled for over two months, and WSOR's President noted in a letter that perhaps the sale was "not meant to happen" based on the parties' inability to agree to certain terms, including the scope of IC&E's retained exclusive access rights.  (*Id.*, Ex. T at DM&E002219.)

In an attempt to restart the negotiations, WSOR's attorney sent IC&E's attorney an email on April 28, 2004, listing various "outstanding issues."  The email specifically discussed the unresolved issue of how to identify the scope of IC&E's retained exclusive access rights:

> Identification of customers.  Is the IC&E happy with the present wording that just identifies Freedom Plastics as an IC&E customer?  Also GM would be jointly served by IC&E and WSOR.

(Kennedy Decl., Ex. V.)   IC&E responded by circulating a revised APA on May 27, 2004, in which IC&E struck the phrase "industry, shipper, receiver or other facility" from § 1.02 and replaced it with "Freedom Plastics," consistent with the final, signed version of the APA.  (*Id.*, Ex. Z at WSOR000222.)

This overwhelming evidence of a protracted, deliberate negotiation ultimately arriving at the phrase "service to Freedom Plastics" compels the conclusion that it was

not a product of thoughtless, sloppy drafting, but rather of a determined and ultimately successful effort by WSOR to limit IC&E's (and now DM&E's) exclusive access rights to IC&E's existing customers (both active and inactive) at the time of the sale, despite repeated, unsuccessful efforts to broaden the scope of the provision. *Cf. Consol. Rail Corp. v. Grand Trunk W. R.R. Co.*, No. 09-10179, 2009 WL 3460334, at *3 (E.D. Mich. Oct. 22, 2009) (interpreting a similar exclusive access provision with respect to serving a "Trenton Steel Warehouse") (emphasis added).

By contrast, DM&E's proffered interpretation of § 1.02 of the APA and § 2.1 of the TRA as granting exclusive access to serve the Freedom Plastics location or facility, regardless of the company occupying it, is contradicted by the extrinsic evidence of the parties' contemporaneous, undisputed negotiations over those sections, as well as the plain language of the parties' agreements.  As such, DM&E's interpretation is barred both as a matter of law and undisputed fact, and Counts I and II of its complaint for breach of contract are without merit.[12]

---

[12] While the discussion above is more than sufficient to explain the basis for dismissing DM&E's breach of contract claims, the court would be remiss not to note that an interpretation of the contract restraining all competition for rail services at a facility or location in perpetuity would also be problematic because it places unreasonable restrictions on trade.  *See generally* Interstate Commerce Act, 49 U.S.C. § 10101 ("In regulating the railroad industry, it is the policy of the United States Government (1) to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail; . . . [and] (5) to foster sound economic conditions in transportation and to ensure effective competition and coordination between rail carriers and other modes[.]").  Both parties agree that exclusive access rights are a standard industry practice.  Although allowing IC&E to retain exclusive access to the Spur Track may have been a reasonable tradeoff in a sale that increased the amount of competition on the Rail Lines as a whole, adopting DM&E's interpretation and extending that exclusivity far beyond preserving a customer relationship would severely constrain NAPCO's market options.  These market consequences at least weigh against DM&E's interpretation, especially in light of the

**B.  Ownership Interest of Spur Track**

In addition to the breach of contract claims, DM&E claims in Count III of its complaint that WSOR's use of the Spur Track constitutes trespass, because DM&E owns the personal property constituting the Spur Track.  To state a claim for trespass -- either trespass of real property or trespass of chattel (i.e., personal property) -- a plaintiff must demonstrate ownership or possession of the alleged trespassed property.  *See, e.g.*, *Laska v. Steinpreis*, 69 Wis. 2d 307, 320, 231 N.W.2d 196, 203 (1975) ("The right to possession is a necessary element in an action based on trespass."); *Wis. Power & Light Co. v. Columbia County*, 3 Wis. 2d 1, 8, 87 N.W.2d 279, 282 (1958) ("An intentional interference with the possession or physical condition of a chattel in the possession of another, without justification, is a trespass.").  Therefore, as a threshold matter, DM&E must demonstrate an ownership interest in the Spur Track, something it cannot do on this record.

IC&E sold "all fixtures and articles of personal property attached to or located on the real property that constitutes the Rail Lines, . . . except for spur trackage used solely to serve Freedom Plastics."  (APA at § 1.01.)  According to the terms of the APA, the parties contemplated that IC&E would retain ownership of the personal property (e.g., material constituting the physical tracks, etc.) of the Spur Track, though as has been previously discussed, only an easement in the real property on which the personal property sits.

---

plain language of the parties' contracts and their straightforward negotiations on this point.

Unfortunately for DM&E, the analysis does not end with the APA.   At the closing, IC&E executed a quitclaim deed as required by the APA.  The conveyance of property detailed in the quitclaim deed conflicts with the description of the property to be transferred in the APA.  The quitclaim deed conveyed the real property making up the Rail Lines -- with the exception of an easement for the Spur Track -- "<u>together with</u> all improvements and structures located thereon, therein, or thereunder, and specifically including . . . spurs" -- subject to the same easement for service to Freedom Plastics. (Deed at WSOR000019-21 (emphasis in original).)  In other words, under the quitclaim deed, the personal property constituting the Spur Track was also transferred to WSOR.

That the parties ultimately adopted this approach is unsurprising, since to do otherwise would have undermined WSOR's repeated goal, as expressed in the APA to extend IC&E's exclusive right to service on the spur track to Freedom Plastics only.  To have followed the original language in the APA would have instead frozen IC&E's exclusive ownership in the personal property for all purposes, whether or not Freedom Plastics went out of business.  The only other option to accomplish this goal would have been agreeing upfront on the ownership in the personal property being automatically transferred upon termination of IC&E's relationship with Freedom Plastics, a far more cumbersome and impractical approach.

Whether or not this was in fact the reason for the parties' departure from strict adherence with the terms of the APA, the language of the Deed controls as a matter of law under the so-called "merger doctrine."  "[T]he delivery and acceptance of an executed deed is considered, prima facie, to merge or supersede the provisions of an antecedent contract which imposes obligations upon the vendor."  *Miles v. Mackle Bros., Div. Deltona*

*Corp.*, 73 Wis. 2d 84, 87-88, 242 N.W.2d 247, 250 (1976).  The merger doctrine is limited to promises that concern the title, possession, and quantity of the property conveyed because those promises are not "collateral" to the deed.  *See* Robert G. Natelson, *Modern Law of Deeds to Real Property* § 17.15 at 475 (1992) ("If the obligation pertains to title and appurtenances, the natural expectation is that the deed will cover the matter.  This, apparently, is the genesis of the rule that promises pertaining to title, possession, and quantity are not collateral and therefore are merged.").

The merger doctrine has been applied to circumstances like those here where the provisions of the deed are inconsistent with the provisions in an earlier buy-sell agreement.  For example, in *Miles*, the leading Wisconsin case on the merger doctrine, the purchase contract provided that the seller would pay all taxes on the property until it was sold, whereas the later executed deed specifically excepted the 1966 and 1967 taxes from its covenants.  *Miles*, 73 Wis. 2d at 87-88.  The Wisconsin Supreme Court held that the purchase contract merged into the later deed, thereby extinguishing the prior promise to pay all taxes owed up to the date of sale.  *Id.* at 88-89.  *Cf. Louis & Karen Metro Family, LLC v. Lawrenceburg Conservancy Dist.*, 538 F. Supp. 2d 1045, (S.D. Ind. 2008) (holding that seller's right to repurchase in purchase agreement was extinguished by the doctrine of merger); *Skidmore v. First Bank of Minneapolis*, 773 P.2d 587, 589 (Colo. Ct. App. 1988) (holding that easement was not exclusive where exclusivity provision in prior agreement was merged into quitclaim deed which did not contain such language).

In an attempt to avoid application of the merger doctrine, DM&E argues that its rights in personal property here were collateral.  Collateral rights in a purchase agreement that are not subject to merger are rights not having to do with possession, title or quality

22

-- for example, promises to make improvements or repairs after the execution of the deed. *See, e.g.*, *Callaway v. Evanson*, 272 Wis. 251, 254-55, 75 N.W.2d 456, 459 (1956) (holding that prior agreement where defendant agreed to construct house and furnish materials and labor did not merge in the warranty deed).  The retained ownership of the personal property constituting the Spur Track, however, is not in any sense collateral. On the contrary, the transfer of the real and personal property constituting the rail lines, including the spur track, is the very subject of the Deed.

DM&E also argues that the merger doctrine does not apply at all to personal property, like physical materials constituting a spur track.  But, here, the conveyance of all personal property, including the Spur Track, was part of a real property transaction. This is distinct from the facts in *Joseph Oldsmobile/Nissan, Inc. v. Tom Harrigan Oldsmobile, Inc.*, No. 14788, 1995 WL 276804, at *4 (Ohio Ct. App. May 10, 1995) (cited at Pl.'s Reply Br. (dkt. #56) at 18), where the plaintiff attempted to apply the merger by deed doctrine to a transaction entirely concerning the sale of goods, and not involving a real estate transaction.

The other case cited by DM&E -- *Ferro v. Miller*, 246 N.Y.S.2d 149, 152 (N.Y. App. Div. 1963) (Pl.'s Opp'n Br. at 17-18) -- is also distinguishable.  The *Ferro* court found that the personal property clause in the contract did not merge with the deed, not because the property at issue was personal property, but rather because the personal property clause was collateral to the conveyance of real property in the deed.  In *Ferro*, however, the deed was silent as to the contested personal property; here, the contested personal property – the rails and other material constituting the Spur Track -- is expressly conveyed in the Deed.  Moreover, the fact that IC&E drafted the deed provides further

23

support for applying the merger doctrine.  *Cf. Miles*, 73 Wis. 2d at 89 (noting that the buyer could have refused to accept the deed after reviewing it).  Preserving ownership as expressly provided in the APA was fully within IC&E's control, and it apparently made an affirmative decision to draft the Deed to convey all real and personal property with a narrow easement with respect to two businesses, which is certainly consistent with the parties' overall negotiations if not the APA.[13]

Here, the Deed transfers both categories referred to in the APA -- "the real property that constitutes the Rail Lines" and "all fixtures and articles of personal property attached to or located on the real property that constitutes the Rail Lines."[14]

As proof of its ownership, DM&E also points to "the fact" that it (and previously IC&E) maintained the Spur Track up until WSOR began using it in June 2009.  This fact is in dispute, however, and DM&E failed to submit admissible, credible evidence of its maintenance from 2004 until the end of 2009.  (*See* Def.'s Response to Pl.'s PFOFs (dkt. #58) ¶ 29.))  Even if IC&E and DM&E solely maintained the Spur Track during

---

[13]   The parties alternatively dispute whether the physical material constituting the Spur Track is part of the real property or is separate personal property.  Courts vary in the treatment of rails as real or personal property.  *See, e.g., Consol. Rail Corp. v. Grand Trunk W. R.R. Co.*, No. 09-10179, 2009 WL 3460334, at *11 n.12 (E.D. Mich. Oct. 22, 2009) (comparing cases where court have found rails to be real property with cases where rails have been found to be personal property).  Regardless of whether the Spur Track could be legally construed as a fixture and therefore real property, the parties opted to treat the physical materials constituting the Spur Track as personal property in the APA, and the Deed conveys it to WSOR as such.  The fact that a deed transfers real property does not restrict it from transferring personal property.

[14] A Bill of Sale was also executed at the closing.  (Kennedy Decl., Ex. F.)  This bill simply relies on the APA in defining the Property conveyed.  (*Id.* ("as those terms are defined in the Asset Purchase Agreement between IC&E and WSOR, dated as of June 8, 2004").)  As such, the Bill of Sale does not advance the analysis.  Regardless, those provisions do not control the straightforward conveyance of real and personal property found in the Deed.

their exclusive use of it, this does not demonstrate -- or even, support -- a finding of DM&E's ownership of the personal property constituting the Spur Track.   Rather, IC&E's and DM&E's purported maintenance of the Spur Track makes sense in light of their exclusive use of it from the sale of the Rail Lines in 2004 until WSOR's use of the Spur Track in June 2009.

Even if the Deed did not merge with and override inconsistencies in the APA's provision regarding the transfer of personal property, DM&E has put forth no evidence establishing that WSOR's trespass on the Spur Track has "impaired . . . its condition, quality or value" or "deprived [DM&E] the use of the [Spur Track] for a substantial time."  *Wis. Tel. Co. v. Reynolds*, 2 Wis. 2d 649, 653, 87 N.W.2d 285, 288 (1958).   At summary judgment, DM&E "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation and quotation marks omitted).

DM&E argues that over time WSOR's use of the Spur Track will cause damages, but presents no evidence of actual or impending damage, or of WSOR's unwillingness to pay for its share of any such damage, just as it has begun to share in maintenance costs now that it is using the Spur Track.   The mere speculation of future damage is not sufficient to withstand summary judgment.  *See, e.g.*, *In re Jetblue Airways Corp. Privacy Litig.*, 379 F. Supp. 2d 299 (E.D.N.Y. 2005) ("[P]laintiffs have not established an actual injury sufficient to sustain a claim for trespass to chattels."); *Pearl Invs., LLC v. Standard I/O, Inc.*, 257 F. Supp. 2d 326, 354 (D. Me. 2003) (granting summary judgment to defendant because "even assuming *arguendo* that [defendant] did access [plaintiff's]

network without authorization, there is no evidence that in so doing he impaired its condition, quality or value").

DM&E also claims damages due to loss of exclusivity, but it is undisputed that DM&E continues to use the Spur Track regularly and therefore WSOR's use has not "deprived" DM&E the use of the Spur Track "for a substantial period of time."   At bottom, a claim for loss of exclusivity is no more than a backdoor attempt at liquidated damages for violating supposed exclusive access rights under the APA and TRA, rights which IC&E and, therefore, DM&E ultimately failed to retain in the Deed of Sale.


ORDER

IT IS ORDERED that:

1.  defendant Wisconsin & Southern Railroad Co.'s motion for summary judgment (dkt. #39) is GRANTED;

2.  plaintiff Dakota, Minnesota & Eastern Railroad Corporation's motion for summary judgment (dkt. #25) is DENIED; and

3.  the clerk of court is directed to enter judgment for defendant and close this case.

Entered this 19th day of August, 2010.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge